```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

OSEN LLC,

                Plaintiff,

        v.                              17 CV 4457 (KPF)

UNITED STATES CENTRAL COMMAND,

                Defendant.

------------------------------x
                                        New York, N.Y.
                                        November 9, 2017
                                        5:30 p.m.
Before:

                HON. KATHERINE POLK FAILLA,

                                        District Judge

                        APPEARANCES

OSEN LLP
        Attorneys for Plaintiff
BY:   MICHAEL JACOB RADINE
      WILLIAM ADAM FRIEDMAN

UNITED STATES ATTORNEY'S OFFICE, SDNY
        Attorneys for Defendant
BY:   ANDREW EDWARD KRAUSE
```

1           (Case called)
2           THE DEPUTY CLERK:  Counsel, please identify yourselves
3   beginning with the plaintiff.
4           MR. RADINE:  Good afternoon, your Honor.  Michael
5   Radine from Osen LLP.
6           MR. FRIEDMAN:  Good afternoon, your Honor.  William
7   Friedman of Osen.
8           THE COURT:  Good afternoon to both of you.
9           Could you just let me know, please, to whom I should
10  be directing my attentions.
11          MR. KRAUSE:  Good afternoon, your Honor.  Andrew
12  Krause for the U.S. Attorney's Office.
13          THE COURT:  You are all welcome.  I'm very interested
14  in the case.  And the joint letter, and I understand the
15  parties' proposed schedule which makes sense to me, but this is
16  a case in all candor, very different from other cases that I
17  have.  So I'd like to hear a little bit more about the factual
18  background.
19          Mr. Radine, if I could just begin -- I think I
20  understand what this case is about, because I read the
21  complaint and all the materials, but I really want to make sure
22  I understand it.
23          If you could just give me the cliff notes version of
24  what it is you're trying to do.
25          MR. RADINE:  Sure.  Thank you, your Honor.

1              Our firm represents hundreds of U.S. soldiers and
2    family members of U.S. soldiers who are killed or injured in
3    terrorist attacks while serving in Iraq.  We bring civil claims
4    on their behalf against Iran which supported these terrorist
5    attacks and is responsible for them, along with certain
6    corporations that we allege helped Iran do that.
7              The first step in bringing these claims is attributing
8    each terrorist attack to Iran.  There are a few ways of doing
9    it.  One way is the use of a particular weapon, the explosively
10   formed penetrator, EFP.
11             When it's found in Iraq, it's a signature weapon of
12   Iranian involvement.  It's a notorious weapon dating back to
13   about World War II.  It's sort of a sophisticated type of
14   improvised explosive device.
15             High explosives packed into it explode in a trigger,
16   and it fires a copper lining that as it's fired out, forms a
17   slug that weighs several pounds, travels about a mile a second,
18   and simply cuts right through an armored vehicle causing
19   horrible, devastating damage to the men and women inside those
20   vehicles.
21             It had a big role to play in Iraq and Afghanistan
22   against our troops.  It's been the subject of countless public
23   government reports, press conferences, press releases, and
24   nongovernmental news stories, articles, academic research,
25   books, and so on.  Their effect and how they work are

well known.  There are patents for them that are publicly accessible and so on.

For us to show that an EFP was used in a particular attack, we used, among other things, investigatory documents prepared by the military.  So, after an attack occurs in Iraq, the military then arrives on scene.  They investigate.  They take pictures of the damaged vehicle.  They write up their findings, and these reports, including their findings and these pictures, are often stored at U.S. Central Command.

So, to get these documents, we made FOIA requests for them to U.S. Central Command, after receiving what we felt was insufficient production, we brought the suit.

Since the commencement of it, I have to say both Cen. Comm. and especially Mr. Krause, have been exceedingly helpful in locating documents for us and producing documents.  It's an ongoing process, and we're sharing additional terms to help them locate more documents and so on.  We're hopeful that will lead to eventually a full production.

THE COURT:  Or at least something that doesn't require additional litigation before me.  Perhaps I'm just speaking from this side of the bench.  I understand.

In terms of the request that you're making, Osen is able to make these simply as an entity?  Can it just make these FOIA requests?  Or is it your representation of the individuals who were effected by these matters who are family members of

1  servicemen or I guess injured servicemen?  How is it that you

2  get the standing to bring this?  Is it simply because you

3  yourself, your firm, can make a FOIA request?

4            MR. RADINE:  That's right.

5            THE COURT:  So, even if you were not representing

6  these individuals, you would be able to make these same

7  requests?

8            MR. RADINE:  Correct, your Honor.

9            THE COURT:  And the schedule that you've given me

10 seems aggressive but doable.

11           So is it your expectation that you and the government

12 and Cent. Comm. Will be able to work out differences?  Are

13 there differences right now?

14           MR. RADINE:  There is one other difference, aside from

15 the scope of production, which, as I said, hopefully we'll be

16 able to work out, and that relates to redactions that Cent.

17 Comm. has made in the documents that they've produced so far.

18           The redactions we don't contest all relate to the

19 privacy of individuals and so on.  But the redaction of

20 interest to us is primarily redactions showing the damage

21 caused by the EFP when it struck and penetrated into the

22 vehicle.  These are sometimes called strike points, and they

23 help show that an EFP is what in fact hit the vehicle and what

24 in fact caused the injuries therein.

25           Prior to the production to us, we've understand this

as public knowledge, how EFPs penetrate armor, how they hit armor. In a production that Cent. Comm. made to a different requestor but relating to one of the attacks that we made a request for, they made a production of all the relevant documents with no redaction to strike points whatsoever.

To us they've redacted some of these images, but even then, it's been very inconsistent. Of the 2,000 odd pages they produced to us so far, there are maybe -- and I'm estimating -- a couple hundred photos of vehicular damage. Of those, a significant portion -- again, I'm estimating. Maybe 30 percent -- of the image of the EFP strike point is not redacted.

In other cases, the redaction is not of what seems to us to be the material information such as the actual hole with the daylight coming through it which seems to us straightforward what an EFP does.

In some cases, they produced the same image twice. Some of our requests overlap. In one case, the image is redacted. In another, it's not. There are other examples. I won't belabor the Court.

In some cases, they redacted information of minority at the time. They redacted the word "copper," which is important. It indicates that a copper lined EFP was used. I'm estimating maybe 20 percent of the time the word would appear unredacted in the very next paragraph or on the next

page.

So these redactions -- there are two issues. One is the issue of whether it's withholding any information that has national security value to begin with.

Again, these weapons are well known. The armor is not particularly sophisticated armor. We're talking bold steel, ballistic glass. These aren't things that our enemies or the public have any challenge of learning about. There is nothing exotic here.

The extent to which this is important to Cent. Comm. in which they've disclosed these images to others, both in the FOIA context and in press releases and then disclosed them to us in dozens of these images, the result is that the redactions don't keep our troops any safer. The redactions don't keep this information from our enemies.

What they do is they keep the information that's specific to our clients that relates to the attacks that they were in away from our clients who are the only party really affected by these redactions.

We've sent this information, some examples, to Mr. Krause. I know he's passed them on to Cent. Comm. Hopefully they'll be able to work out something along those lines, and hopefully they'll give it some more thought, but that's our current concern, these redactions.

THE COURT: Thank you very much.

1                Is there anything else would you like me to know, sir?

2            MR. RADINE:  I think that's it for the moment.  The

3   documents they produced have other helpful evidence, and we

4   have other evidence showing that these EFPs were used in these

5   attacks, but more evidence is helpful to us, especially with

6   the number of clients involved in these attacks.  So it's

7   always helpful.

8            THE COURT:  Thank you.

9            Mr. Krause, I'd be happy to hear from you and your

10  client.  I'd be interested in the government's perspective with

11  respect to the production of documents.  I do understand if at

12  this time you and your client are still working through or

13  coming to a final decision about how and the extent to which

14  you'll be producing this material.

15           MR. KRAUSE:  That's correct, your Honor.  The search

16  process is ongoing.  As Mr. Radine indicated, we've had a very,

17  I think, productive and collaborative, iterative process of

18  locating documents, going back, doing additional searches,

19  sometimes based on additional information that's been provided

20  by counsel that has yielded additional results in Cent. Comm.'s

21  queries of its various databases.  So that process is still

22  ongoing.

23           We have a production that we anticipate making based

24  on the schedule that we've laid out before Thanksgiving which

25  will be another 900 pages or so, which is really another

1    50 percent increase above and beyond what we've produced so
2    far.
3              So documents are being located, and we're hopeful that
4    we'll be able to at least deal with the adequacy of the search
5    aspect of the case without need for further litigation.
6              It is possible ultimately that we may not locate all
7    of the documents that counsel is looking for, but we will have
8    further discussion about that and determine whether any
9    briefing needs to be pursued on those issues.
10             With respect to the withholdings, that's something
11   that we are sort of just starting to explore.  Some of these
12   additional examples that Mr. Radine has been provided have been
13   provided in the last week or two.  I have passed those along to
14   my client.
15             With respect to one, I've recently learned of one
16   example where Cent. Comm. did release information in response
17   to a different FOIA request.  My understanding currently is
18   that the vehicle that was depicted in that image is an older
19   type of vehicle that's not currently in use in the theater
20   anymore.  So that may have had a role in terms of what was and
21   wasn't withheld.
22             As far as inconsistency in terms of what has been
23   produced, certainly we'll take a look at those.  I don't know
24   that we've been provided with specific examples of those, but
25   we'll do our best to reconcile those issues.

1           As a general matter, I think that Cent. Comm. is
2    concerned with ensuring that it doesn't provide information
3    that could give adversaries against the United States any
4    information about vulnerabilities in the vehicles that have
5    been subject to the attacks.
6           That's fundamentally the purpose for the
7    classification determination, and those classification
8    determinations are pursuant to classification guides that are
9    used routinely at Cent. Comm.
10          If we needed to brief those issues, that would
11   essentially be the basis of the argument.  We'll see how many
12   of those issues remain after we go through what I hope will be
13   another productive process to narrow the scope of those
14   considerably.
15          THE COURT:  Now, I'm not asking you to change the
16   schedule that you've given me, but by the same token, I don't
17   want to have a situation where I'm getting monthly requests for
18   extensions because, despite everyone's best efforts, these
19   materials could not be produced.
20          This is our initial pretrial conference, and normally,
21   if you want to call what you're doing as fact discovery, I
22   would normally give the parties approximately four months to
23   get fact discovery done.
24          Is it your belief, Mr. Krause, that -- what I'm saying
25   is all additional responsive documents will be released on or

1  before the 22nd of December.

2             Is that doable, sir?

3             MR. KRAUSE:  I don't think we say "all," your Honor.

4             THE COURT:  I did put that word in there.  I thank
5  you.  Why I say that is because there is a meet-and-confer and
6  remaining issues in January that sort of presupposes that all
7  but the withheld ones will be perused.

8             Am I mistaken?

9             MR. KRAUSE:  I don't think that is necessarily the
10 case.  We have this set of 900 documents that will be produced
11 by November.  At this point, there are two sort of principal
12 buckets, if you will, of additional documents.

13            One is a set of documents from a database that's known
14 by the letters CEXC.  That database has been queried.
15 Documents have been located.  Cent. Comm. is in the process of
16 extracting documents from that database.  They're having some
17 difficulty doing that for various technical reasons.

18            I'm not sure what the volume of documents will be from
19 that data base.  There will be additional documents.  We expect
20 or hope at least that we will be able to produce some or all of
21 those documents by the December deadline.

22            Based on recent discussions with counsel, we have an
23 additional 20 or so -- I think it's 19 referred to in the
24 letter -- incidents for which we are conducting additional
25 searches based on information that's been provided.  Those

1   searches are ongoing, and we hope to have by next week a sense
2   of the volume of additional materials that would be responsive,
3   based on those searches.
4            Depending on what the volume is, I'm not sure whether
5   we'll be able to produce those all by December 22.  It would be
6   our hope to do that, but if it turns out to be an additional
7   8,900 pages of documents, it may not be possible to do all 900
8   pages in that timeframe because of the redaction issues
9   involved.
10           There is also the additional category which is briefly
11  alluded to in the letter of what we're referring to as casualty
12  report documents.
13           THE COURT:  Yes, sir.
14           MR. KRAUSE:  These are documents -- as I understand
15  plaintiffs' position, we've produced a couple of these as
16  exemplar documents to see if these are documents that counsel
17  are interested in and needs to have for purposes of its ongoing
18  litigation.
19           We're prepared to produce those, but they're
20  voluminous, and the types of redactions involved there are
21  somewhat painstaking because they include lots of different
22  names, not necessarily names of decedent's which wouldn't be
23  subject to withholding under FOIA but names of other active
24  military duty personnel who are involved, for example, in
25  evacuation of the service member or treatment of the service

1   member at a different hospital or military base.  So there need
2   to be a lot of different redactions there in order to withhold
3   personally identifiable information.
4           We're involved in a process to try to figure out if
5   there are ways to expedite the processing and release of those
6   documents.  We haven't necessarily provided for a production
7   timetable for those here, but I actually am hopeful that the
8   redactions in those documents wouldn't necessarily be issues
9   that would have to be presented to the Court.
10          I don't think they're going to be issues that we can
11  dispute because of the nature of the documents and the nature
12  of the redactions.  The one thing that we've briefly talked
13  about is that when we have that meet-and-confer in January,
14  proposing an additional schedule which at that point I think
15  would allow us to propose a final production schedule and
16  potentially, depending on where we are with things, with the
17  Court's permission, set a briefing scheduling to deal with
18  whatever substantive issues remain, even as Cen. Comm. is
19  producing the casualty report documents so we don't necessarily
20  delay the resolution of the substantive issue with respect to
21  the withholding for the production of the casualty report
22  documents which probably will not impact the withholding issue.
23          THE COURT:  So I should expect a similarly detailed
24  schedule in or about January.
25          MR. KRAUSE:  Right.  Our hope is that that will be the

1  last schedule, that we'll comply with the schedule as proposed.
2  I don't think we should need any extensions of those dates.
3         Then we propose the final schedule in January, which
4  my hope would be a final production schedule as well as a
5  briefing schedule for whatever issues need to be briefed at
6  that point.
7         THE COURT: Let me just confirm with plaintiffs'
8  counsel that you have that same understanding.
9         MR. RADINE: That's right, your Honor.
10        THE COURT: That is fine. For me, there is no case
11 management plan to endorse. What I would do instead would be
12 to endorse the schedule in your joint letter to me of the 2nd
13 of November and then, for my own notes, just diary my schedule
14 to anticipate receiving in or about the second half of January
15 a second schedule and hopefully final schedule for the
16 production of documents which may, as needed, include a
17 schedule for briefing.
18        Am I correct?
19        MR. RADINE: Yes, your Honor.
20        THE COURT: Sounds great. Let me commend you for
21 playing so nicely together but also for being so detailed in
22 your communications with me.
23        I'm happy to let you handle the administration or sort
24 of the progress in this case because you don't need my
25 supervision, and it's the rare case when I can say that. So I

1  am thankful to you for being so self-sufficient.  I will look
2  forward to your letters in January.
3              I'll ask, Mr. Krause, if you could, please just order
4  a transcript of this conference so that we have it on record.
5              With that, unless anyone has anything else to add,
6  we're adjourned.
7              Anything else?  No.  Okay.  Thank you very much for
8  coming in.
9              MR. KRAUSE:  Thank you, your Honor.
10             MR. RADINE:  Thank you, your Honor.
11             MR. FRIEDMAN:  Thank you, your Honor.
12             (Adjourned)
13
14
15
16
17
18
19
20
21
22
23
24
25