UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
OSEN LLC                                             :
                                                     :     Case No. 17-cv-4457 (KPF)
                           Plaintiff,                :
                                                     :
              -against-                              :
                                                     :
UNITED STATES CENTRAL COMMAND                        :
                                                     :
                           Defendant.                :
---------------------------------------------------------------x


# PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE PURSUANT TO LOCAL CIVIL RULE 56.1


OSEN LLC

Michael J. Radine
William A. Friedman
1441 Broadway, Suite 6022
New York, New York 10018
Tel.: 212.354.0111

*Attorneys for Plaintiff*

Purusant to Local Rule 56.1 of the Local Rules of Civil Practice in the U.S. District Court for the Southern District of New York, Plaintiff submits the following statement of material facts as to which there is no genuine dispute. Where indicated, materials cited in this Rule 56.1 Statement are being submitted as exhibits to the Declaration of William A. Friedman, dated May 29, 2018 ("Friedman Decl.").

1. Plaintiff represents hundreds of U.S. service members who were killed or injured in Iranian-backed terrorist attacks (the "Attacks") while serving in Iraq, as well as their families (collectively, the "Victims"). The Victims retained Plaintiff to bring civil suits against Iran and its instrumentalities under the Foreign Sovereign Immunities Act for allegedly causing and materially supporting acts of extrajudicial killing and personal injury implicated in the Attacks, and several international corporations for allegedly conspiring with Iran to provide that material support. *See, e.g.*, Amended Complaint, *Karcher v. Islamic Republic of Iran*, No. 16-cv-232-CKK (D.D.C. Mar. 14, 2016), ECF No. 8; Second Amended Complaint, *Hake v. Bank Markazi Jomhouri Islami Iran*, No. 17-cv-737-TJK (D.D.C. Mar. 9, 2017), ECF No. 23; Second Amended Complaint, *Freeman v. HSBC Holdsings PLC*, No. 14-cv-6601-DLI-CLP (E.D.N.Y. Aug. 17, 2016), ECF No. 115.[1]

2. To prove Iran caused one of the Attacks, Plaintiff highlighted two factors: (1) the use of an Explosively Formed Penetrator ("EFP"), a signature Iranian weapon, and (2) the involvement of Shi'a terrorist groups, called the "Special Groups" by the U.S. military, which were backed by Iran and its Lebanese terror proxy, Hezbollah.

3. An EFP is an anti-armor roadside bomb, which, when precisely designed and manufactured from high quality components, can cut through the armor equipped on Coalition

---

[1] Due to their size, Plaintiff has not annexed these Complaints to its Motion, but can do so at the Court's request.

Forces'[2] vehicles. An EFP is made from a short pipe, generally 6-12 inches in diameter, sealed on the back end (except for a priming hole for the insertion of a detonator), packed with explosives, and capped with a concave, metal "liner." When detonated, the force of the explosion deforms the liner into a slug, travelling at mile a second. See the accompanying Declaration of Russell L. McIntyre dated May 29, 2018 ("McIntyre Decl.") at ¶¶ 29-30.

4.      The high-end EFPs designed and manufactured by Iran were packed with military grade explosives and capped with a liner made of precisely milled, industrially pressed and annealed copper, weighing several pounds. These EFPs, requiring materials and processes far outside the capability of Iraqi terrorists, are all but unstoppable by conventional armor. As General (Ret.) Stanley McChrystal explained:

> [The copper slug], often the size of a bowling pin and traveling at twice the speed of a bullet [sic], punctured inches of metal plating like water through snow. Inside the vehicle, the molten slug cut through legs and torsos, and its heat often lit the cab and the men inside on fire. Our heaviest armored vehicles were vulnerable and despite extensive countermeasures, in large number they were a potential game changer.

Friedman Decl. Ex. 1.

5.      While CENTCOM has produced a substantial number of records to Plaintiff as a result of this lawsuit, it has redacted them heavily. CENTCOM has grouped hundreds of redactions into five very broad categories with limited justifications for each. *See* Defendant's *Vaughn* index, ECF No. 31-2; Declaration of Major General Terry Ferrell ("Ferrell Decl."), ECF No. 31; and Memorandum of Law in Support of its Motion for Summary Judgment, ECF No. 30 ("Br.").

6.      CENTCOM has:

---

[2] "Coalition Forces" is the common name for "Multi-National Forces-Iraq," which was the U.S.-led allied effort in Iraq.

- Redacted almost every single name in the nearly 8,000 pages on privacy grounds, including terrorist *groups*, prominent and confessed terrorists, and public figures like the Prime Minister of Iraq;

- Redacted images of obsolete vehicles (as it has admitted to this Court) on national security grounds;

- Redacted information in the public domain, often previously disclosed via Department of Defense ("DoD") and CENTCOM releases, including releases *within the records produced to Plaintiff*;

- Heavily redacted a set of records relating to a particular Attack, having produced the same exact records to a third party with minimal redactions; and

- Withheld information that the U.S. Army has separately released.

*See* Friedman Decl. Ex. 2.

## FACTUAL STATEMENT

7. To help establish that an EFP was used in an Attack, Plaintiff made FOIA requests for records relating to that Attack from CENTCOM, the combatant command with responsibility for U.S. military operations in the Middle East. Plaintiff initially made one request for 92 Attacks, and subsequently made 168 requests, one for each soldier-Victim. Friedman Decl. Ex.3.

8. Plaintiff specifically requested several types of records, and, after Plaintiff commenced this action, CENTCOM produced varying sets of the records, depending on the Attack. These include:

- Significant Activity ("SIGACT") reports, describing any significant activity, including attacks on Coalition Forces and often including updates from subsequent intelligence and other assessments;

- Improvised Explosive Device ("IED")/Explosive Ordnance Disposal ("EOD") reports and "storyboards," which use text, photographs, and drawings to describe either IED (and EFP) attacks or seizures of IED weapons caches;

- Weapons Intelligence Team ("WIT") reports, providing photographs, drawings, and descriptions made by units examining an attack scene; and

3

- Combined Explosive Exploitation Cell ("CEXC") photographs and reports—CEXC is an in-theater forensics lab system that extracts evidence from IEDs to identify trends and bomb makers and emplacers.

*See* Complaint, ECF No. 1, Exhibit A; Friedman Decl. Ex. 2.

9. Following the initiation of this lawsuit, CENTCOM produced nearly 8,000 pages of responsive records relating to the Attacks, along with casualty reports relating to many of the Victims. *Id*.

10. CENTCOM also produced approximately 240 pages of responsive records relating to the kidnapping and murder of Staff Sergeant ("SSG") Ahmed Al-Taie, whose estate and family members are Victims. *Id*.

11. Following discussions between the parties, CENTCOM has reprocessed and released pages, which removed a handful of redactions, but also produced additional inconsistencies. *Id*.

12. CENTCOM has represented that it redacted information relating to the following categories: (1) convoy operations; (2) counter-IED equipment; (3) EFP design, composition, and placement and EOD techniques; (4) EFP penetration of armor/defeating detection equipment; and (5) identification of individuals. *See Vaughn* Index, ECF No. 31-2.

13. Because Plaintiff made a request for each service-member Victim, even where some Victims were in the same Attack, CENTCOM produced certain materials more than once.

14. When doing so, CENTCOM has redacted different information from identical documents. For example, in its initial release of documents, CENTCOM produced reports in connection with the April 12, 2006 EFP attack that killed Scott Bandhold (Friedman Decl., Ex. 4), which contained an unredacted reference to Counter Remote-controlled IED Electronic Warfare

("CREW") equipment at 1:1715,[3] "[redacted], i.e. Rhino assembly";[4] and unredacted strike point images at 1:1724, 1:1727, 1:1731, 1:1735, 1:1737-41.

15. But in a later production of the same materials, CENTCOM redacted materially different information. Examples include:

- a. On 4:263, CENTCOM redacted the strike point locations, but left the anaylsis unredacted, and redacted "i.e. Rhino assembly," which is the opposite of what it did in the initial release at 1:1715;

- b. On 4:267-68, CENTCOM entirely redacted the images, but only partially redacted them in the initial release at 1:1720-21;

- c. On 4:272, it entirely redacted both the image and text, but left everything *unredacted* in the initial release at 1:1724.

- d. On 4:275 and 4:283, CENTCOM partially redacted images that it left unredacted in the initial release at 1:1727 and 1:1735;

- e. On 4:277 and 4:281, it entirely redacted images that it left unredacted at 1:1729 and 1:1733;

- f. On 4:280 it redacted the text below the image but left it unredacted at 1:1732;

- g. On 4:285-86, it redacted the strike points on the Humvee's wheel that were left visible at 1:1737-38;

- h. On 4:287-89, it redacted both entire images and text but left them unredacted at 1:1739-41; and

- i. CENTCOM's text and image redactions at 4:290 are inconsistent with those at 1:1742.

16. CENTCOM likewise produced multiple reports with inconsistent redactions in the first, second, third and fourth releases of records relating to the August 4, 2008 EFP Attack that

---

[3] Because CENTCOM restarted Bates numbering for six of its productions to Plaintiff, all references to produced records are in the following format: [production number]:[Bates number]. Plaintiff has included all of the productions on Ex. 2 in six files, arranged in Bates number order. Specific pages can be located by opening the file bearing the production number, and entering the Bates number into the viewer's page finder. Plaintiff can provide the records to the Court in another format at the Court's request.

[4] A "Rhino" is a heated device attached to an arm extending from the front of a vehicle. The heat acts as a decoy for EFPs triggered by passive-infrared receivers, causing them to fire early and pass in front of the vehicle.

killed Johnathan Menke (Friedman Decl. Ex. 5). As between the first and second releases, CENTCOM:

    a. Left unredacted references to copper, *see, e.g.*, 1:1526, 1:1541 ("copper fragments"), 1:1542 ("copper residue was observed in both penetrations"), but redacted it 2:79 and again at 3:557.

    b. Left unredacted EFP size at 1:1547-48 ("2 x 8 [inch] EFP") but redacted it at 2:85-86. Both productions leave CREW equipment unredacted (". . . ECM Systems: Rhinos and Dukes[5]");

    c. Left unredacted a strike point image at 1:1538, which it redacted at 2:76;

    d. Redacted EOD capabilities at 1:1540 and 1:1541, which it left unredacted at 3:556 ("EOD team performed 5/25 searches"), and at 3:557 (disarming technique)

    e. At 3:558, CENTCOM redacted "2X penetration to the front right side of the M1151. Copper residue was observed in both penetrations," and

    f. Redacted the distance of the "blast seat" from the road at 1:1542, but not 3:558 ("2m").

    g. CENTCOM redacted an image of the blast seat at 3:591, but not at 3:612[6]

    h. CENTCOM redacted text at 3:596, 3:598 and 3:605 that was unredacted at 3:557-58.

    i. CENTCOM left unredacted EOD capabilities such as "performed 5/25 searches" and "sweep for possible initiation systems and evidence" at 4:644 that it redacted at 1:1525; and

    j. Left unredacted that the "device was angled up approximately 12 degrees from the ground and approximately 45 degrees toward the ongoing traffic," at 4:645 which it had redacted at 1:1526.

17. In the initial, third and fourth releases of documents for the January 10, 2009 Attack that killed Justin Bauer (Friedman Decl, Ex. 6), CENTCOM:

    a. Left unredacted numerous references to the copper EFP at 1:1756, 1:1759, 1:1772-73, 1:1780, 4:1125, as well as the location of the impact points and sizes

---

[5] A "Duke" is an electronic countermeasure ("ECM") designed to jam the electronic operation of IEDs.

[6] No other production contained a redacted image of the blast seat, which is the crater left behind by the EFP device post-detonation.

6

of the EFPs at 1:1758, "2 slugs penetrated the hull"; 1:1772, "[s]lug damage consistent with 3 x 6 sinch EFP slugs . . . clearly 2 points of impacts where copper EFPs entered the vehicle on the driver's side"; 1:1773, "[damage] consistent with 6 inch EFPs"; 1:1780, "[s]lug damage to the vehicle is consistent with 6 inch EFP slugs"; but, CENTCOM redacted this information from the 3rd release at 3:795-96, 3:805.

b. Left unredacted the name of the assessed perpetrator of the attack at 1:1780 but redacted it at 3:808,

c. Made complete redactions of images at 3:815 that it only partially redacted at 1:1756,

d. Made extensive redactions of strike point locations at 3:817-18 that it left unredacted in at 1:1758-59,

e. Redacted entire images at 3:823-26 that it only partially redacted at 1:1764-67, and

f. Fully redacted the angle of attack at 3:828 that was only partially redacted at 1:1769.

### A. Iran's Direction of Shi'a Terrorist Groups to Attack U.S. Forces

18. In 2003, Coalition Forces overthrew Saddam Hussein's Sunni minority-led Ba'athist regime, a long time enemy of Iran, a Shi'a-Islamic theocracy. Iran took the opportunity to increase its influence in Iraq, including by sponsoring attacks on the occupying U.S. forces, Iraq's fledging government institutions, and Iraq's Sunni population. To do so, Iran, working through its paramilitary group the Islamic Revolutionary Guard Corps ("IRGC"), the IRGC's special operations group, Qods Force ("IRGC-QF"), and its Lebanese terror proxy, Hezbollah, developed pre-existing and emerging Shi'a extremist groups, including the Badr Organization, Jaysh al-Mahdi ("JAM"), run by Moqtada al-Sadr, its splinter cell, Asa'ib Ahl al-Haq ("AAH"), run by brothers Qais and Laith Khazali and responsible for the coordinated attack on the Provincial Joint Coordination Center in Karbala, Iraq which killed five U.S. soldiers, the designated foreign terrorist organization Kata'ib Hezbollah ("KH") and other groups. *See* McIntyre Decl. at ¶¶18-25.

19. These groups have been designated by the U.S. government for conducting Iranian-backed terrorist attacks on U.S. forces. The government has also designated many of their leaders and members. Friedman Decl. Ex. 7.

20. As Shi'a and Iranian influence has grown in Iraq, so too has the profile of many of these terrorists. Moqtada al-Sadr's political party recently won Iraq's parliamentary elections. Friedman Decl. Ex.8.

21. Qais Khazali, also a prominent figure, gave an interview to PBS's Frontline program in February, 2018. *See* https://vimeo.com/257995148.

22. The Special Groups have, to varying degrees, since integrated into the Iranian-backed Popular Mobilization Forces, which confronted Iran's enemy, the Islamic State in Iraq and al-Sham ("ISIS") in northern Iraq. McIntyre Decl. ¶ 57.

**B.     EFPs and Their Physical Impact on Now Obsolete U.S. Armored Vehicles**

23. EFPs and their effect on U.S. armored vehicles in Iraq between 2004 and 2011 were not just matters of public knowledge during the relevant period, they were the subject of DoD press briefings. Friedman Decl., Ex. 10.

24. Much of this information is publicly available. For example, the DoD released a close-up picture of an EFP strike on a High Mobility Multipurpose Wheeled Vehicle ("Humvee") to CNN, which reported in a news segment:

> look at this picture provided to CNN by the Army. It's one of the first images shown publicly by the damage caused by a new type of IED—a so-called "explosively formed penetrator" that can penetrate U.S. armored vehicles.

Friedman Decl., Ex. 10. In the video, Lt. Gen. Russel Honoré, then-commander of the U.S. First Army, describes, on-camera, the effect of the weapon on U.S. armor: "that metal . . . can be effective against any armor, including the M1 tank." *Id.* CNN then showed additional photos from the Army, which clearly showed EFP strike-points on a Humvee of the type CENTCOM redacted

8

here. The CNN video then reported: "the technology has been available for decades; much of the information is available on the internet." *Id.*

25. The DoD has typically not withheld information relating to EFPs and their effect on armor. For instance, the Army has released a 124-page report on EFPs and similar weapons, with accompanying exhibits (including a high-speed camera video of an EFP impacting on a Humvee door), going into extreme detail as to how they work against armor. Friedman Decl., Ex. 11.

26. Patents for EFPs, assigned to the U.S. military, providing exact technical specifications, are readily available online. *See* McIntyre Decl. ¶ 51.

**C. The Lewis Production**

27. On January 30, 2015, documentary filmmaker (and former Assistant Deputy Under Secretary of Defense) David Scantling submitted a FOIA request to CENTCOM for records relating to the March 13, 2006 EFP attack in Baghdad that killed U.S. Army SSG Brian Lewis. SSG Lewis's wife is one of Plaintiff's clients. Friedman Decl., ¶13, Ex. 12.

28. On November 19, 2015, CENTCOM produced to Mr. Scantling several records: (1) an "IED Report," (2) a "SIGACT," (3) a document titled "C2OPS Watch Highlights," (4) a page from a presentation prepared by Multi-National Corps-Iraq, the coalition entity that supervised ground operations in Iraq, and (5) a WIT report. Friedman Decl., Ex.13.

29. The records provided considerable detail on the composition of the targeted convoy ("composition of the patrol was 3 x M1114"), distance between vehicles ("30 Meters"), an electronic countermeasure ("ECM") meant to defeat IEDs ("2nd M114 [sic] running Warlock SSVJ" [Self-Screening Vehicle Jammer]) and distance of that countermeasure to the EFP ("Nearest ECM Dist to IED: 30 Meters."). *See id.* Most importantly, the production included four,

close-up, clear photographs of the EFP damage to the M1114 Humvee in which SSG Lewis was killed. *See id.*

30. Plaintiff provided this production to CENTCOM twice before commencing this suit—once in a pre-administrative appeal letter CENTCOM's FOIA Public Liaison, James Hogan, and again as part of its appeal of CENTCOM's refusal to produce more than 6 general records. See Exhibits D and E to the Complaint, ECF Nos. 1-4 and 1-5.

31. In bringing this suit, Plaintiff also attached the Lewis Production to its Complaint. See ECF No. 1.

32. On October 31, 2017, Plaintiff sent the WIT report to CENTCOM's counsel in this action- in an attempt to show CENTCOM that its redactions were not internally consistent. Friedman Decl., Ex. 14.

33. Finally, Plaintiff raised the production before this Court during the pre-trial hearing on November 9, 2017. In response, CENTCOM's counsel explained:

> I've recently learned of one example where Cent. Comm. did release information in response to a different FOIA request. My understanding currently is that the vehicle that was depicted in that image is an older type of vehicle that's not currently in use in the theater anymore. So that may have had a role in terms of what was and wasn't withheld.

Transcript at 9:15-21, ECF No. 23.

34. The M1114 Humvee was, in fact, replaced with the M1151 and is no longer used in theater. McIntyre Decl., ¶ 39.

35. Although the M1151 has a slightly extended chassis and more powerful engine than the M1114, allowing it to maneuver better when carrying armor, *id.* at ¶ 40, they are essentially the same vehicle.

36. Their standard armor is the same: one-inch thick rolled homogenized steel ("RHA"). RHA is a publicly available material, and the military has released the specifications it requires from its suppliers online. *Id.* at ¶ 31.

37. Both the M1114 and M1151 model Humvees can be fitted with fragmentary armor (or "frag") door kits, which are simply additional RHA plates attached to the doors and thicker ballistic glass for the vehicles' side windows. *Id.* at ¶ 41.

38. There is no material difference between the vehicles in terms of EFP resistance. In fact, due to the ineffectiveness of the Humvee in providing force protection, it is being replaced by Mine-Resistant Ambush Protected vehicles ("MRAPs") and the Joint Light Tactical Vehicle ("JLTV"), specifically due to the Humvee's susceptibility to IEDs. *Id.* at ¶ 39 note 22.

39. CENTCOM produced largely the same set of records to Plaintiff in response to Plaintiff's corresponding request concerning the March 13, 2006 EFP attack as it had to Mr. Scantling. But CENTCOM redacted information throughout the records that was disclosed to Mr. Scantling, including all four pages of photographs of the damage to SSG Lewis's M1114, one of two references to a counter-IED device carried by one of the vehicles in the convoy (the Warlock SSVJ), and references to the composition of the convoy, but omitting (without redacting) the chart providing the remaining convoy information. Friedman Decl., Ex. 15.

D. **CENTCOM's Referral of Records to ARCENT**

40. In or around February 2017, Plaintiff requested "AR 15-6" reports[7] relating to all 168 service member Victims from CENTCOM and the Army. Friedman Decl., ¶17.

---

[7] "Army Regulation 15-6" reports detail findings resulting from Army investigations into the deaths of active duty soldiers.

11

41.     The Army referred 91 of them to U.S. Army Central ("ARCENT"), which "is the assigned Army Service Component Command (ASCC) to the United States Central Command (USCENTCOM) and provides continuous oversight and control of Army operations throughout the USCENTCOM Area of Responsibility."[8] On June 19, 2017, ARCENT produced a list of 32 reports it had located. Friedman Decl., Ex. 16.

42.     On September 6, 2017, CENTCOM produced a list of 34 AR-15 reports it had located in its possession (it found two more shortly thereafter) and stated that it would refer them to ARCENT for processing. CENTCOM states that it referred the records to ARCENT on November 3, 2017. Br. at 6.

43.     Prior to receiving the referrals from CENTCOM, ARCENT provided an estimated release date of October 31, 2017. Friedman Decl., Ex. 16.

44.     On October 17, 2017, ARCENT revised the release date to "around November 20, 2017." Friedman Decl., Ex. 17.

45.      After missing that deadline, ARCENT provided a new release date of December 15, 2017, and then to January 19, 2018. Friedman Decl., Ex.18 and 19.

46.     On February 6, 2018, Plaintiff received 13 reports, and then 7 more in the subsequent months. Friedman Decl., ¶ 22.

47.     However, according to ARCENT's update chart, ARCENT has not produced any of the (non-duplicative) AR 15-6 reports CENTCOM referred to it. Friedman Decl., Ex. 20.

---

[8]     U.S. Army, Organization, https://www.army.mil/info/organization/ (last accessed May 29, 2018).

### E. CENTCOM's Inconsistent and Inappropriate Redactions

48. CENTCOM has generally applied redaction boxes roughly the size of the information in question (generally, strike points on the vehicles). Friedman Decl., Ex. 2 (1:1021; 1:1720-21, 1:1885-87, 1:1256). These are compiled in Friedman Decl., Ex. 21.

49. Unredacted text also frequently gives the location of the strike. Friedman Decl., Ex. 2, 1:1643 ("2 copper slugs penetrated the TC side of the MaxxPro; one through the TC window and one just behind the TC seat"), 4:198 ("Detonation occurred on the right side of the vehicle. The EFP struck the rear of TC door), 1:1759 (""clearly 2 points of impacts where copper EFPs entered the vehicle on the driver's side").

50. However, it has on other occasions redacted entire pages or images—including the same images it minimally redacted elsewhere. Friedman Decl., Ex. 2, *compare* 4:267-70 *with* 1:1720-21; 4:559-562 *with* 1:1885-88. These are compiled in Friedman Decl., Ex. 22.

51. Likewise, CENTCOM on other occasions has redacted text giving the location of the strike. Friedman Decl., Ex. 2 3:885 ("Point of impact: ▇▇▇▇▇").

52. CENTCOM has generally redacted the names of terrorist groups, public figures such as the former prime minister of Iraq and the heads of Iraqi terrorist groups, and the names of terrorists who confessed to participating in the Attacks. Friedman Decl., Ex. 2, 1:1360, 2:130, 3:388, 3:429, 3:509-10, 3:512, 3:526, 3:676-79, 3:707, 3:738-41, 3:744, 6:236.

53. However, in some instances, CENTCOM declined to redact such names and images, Friedman Decl., Ex. 2, 1:831 (names and full page photographs of two men detained as a result of the June 2, 2007 EFP Attack), 3:739, or redacted them inconsistently: "Major General Ali of the N[ational] P[olice] is exposed on 1:1773 but not in the same document at 3:797.

54. Of the 115 EFP Attacks for which CENTCOM produced documentation, 47 specify the type of liner used in the attack—i.e., copper, 37 Attacks (Friedman Decl., Ex. 2, pp. 1:885, 1:960, 1:1048, 1:1083-85, 1:1116, 1:1159, 1:1162, 1:1198, 1:1201, 1:1308, 1:1330, 1:1336, 1:1346, 1:1352, 1:1369, 1:1373, 1:1412, 1:1454, 1:1503, 1:1526, 1:1541-42, 1:1583, 1:1600, 1:1612-13, 1:1617, 1:1643-44, 1:1661, 1:1756, 1:1758-59, 1:1772-73, 1:1780, 1:1870, 2:124, 2:150, 2:162, 2:166, 3:134, 3:136, 3:139, 3:158, 3:217, 3:225, 3:237, 3:243, 3:268-70, 3:281, 3:298, 3:319-20, 3:332, 3:325, 3:333, 3:415, 3:417, 3:420, 3:424, 3:428, 3:439, 3:531, 3:878, 3:880, 3:886, 3:890, 3:890-92, 3:907, 4:120, 4:122, 4:192, 4:218, 4:331, 4:345, 4:397, 4:557, 4:582, 4:773-75, 4:1125) steel, five Attacks (*id.*, pp. 1:1915, 3:164, 3:168, 3:383-84, 3:387-88, 3:394, 4:876, 4:1133-34) and a mixture of steel and copper liners, 4 Attacks (*id.*, pp. 1:1794, 1:1823, 3:115, 3:125, 3:128, 3:623, 3:627, 3:842), whereas it redacted the liner type only a handful of times. *See, e.g.*, Friedman Decl., Ex. 5, 2:79.

55. CENTCOM purportedly classified each photograph relating to each individual attack, but exterior images of armor penetration are sometimes exposed, including in photographs that are redacted when produced a second time. Friedman Decl., Ex. 2, *compare* 1:1844 *with* 1:1850, *and* 1:1928 *with* 1:1929. These are compiled in Friedman Decl., Ex. 23.

56. CENTCOM has redacted other penetration points nearly randomly. For example CENTCOM redacted the interior of doors some of time, but not others, Friedman Decl., Ex. 24, *see* 1:1381 (redacting one image but exposing another on the same page), 1:1952, 1:1952 (exposed), 1:906 (partially exposed), 1:1168 (redacted). The same is true for the frame and undercarriage some of the time, but not others, Friedman Decl., Ex. 25, *compare* 1:1739 *with* 1:533 (redacted).

57. ARCENT has also produced unredacted images of EFP strike points. Friedman Decl., Ex. 26 *see* 1:646, 1:1003.

58. CENTCOM generally did not redact interior images of penetration, *see* Friedman Decl. Ex. 2, 1:1863, although in one case it appeared to simply redact the hole itself: 1:1860.

Dated: New York, New York
       May 29, 2018

By: /s/ Michael J. Radine
    Michael J. Radine
    William A. Friedman
    Osen LLC
    1441 Broadway, Suite 6022
    New York, NY 10018
    Tel.:
    Fax:

*Attorneys for Plaintiff*