UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OSEN LLC,<br><br>                     Plaintiff,<br><br>       -v.-<br><br>UNITED STATES CENTRAL<br>COMMAND,<br><br>                    Defendant. | 17 Civ. 4457 (KPF)<br><br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:

Osen LLC ("Osen" or "Plaintiff") brings this action under the Freedom of
Information Act ("FOIA"), 5 U.S.C. § 552, against United States Central
Command ("CENTCOM" or "Defendant"); Osen seeks documents regarding
attacks on American servicemembers in Iraq from 2004 to 2011. Osen believes
these materials will assist with lawsuits that it has filed on behalf of American
servicemembers injured and killed in Iraq. Defendant has disclosed various
documents in response to Plaintiff's FOIA claims, but the parties dispute
Defendant's withholding of a limited set of information. After winnowing the
dispute down to an even more limited set of issues through the briefing in this
case, Defendants have moved for summary judgment, and Plaintiff has cross-
moved for summary judgment. For the reasons that follow, Defendant's motion
is granted as to the remaining withholdings pursuant to FOIA's sixth
exemption and denied as to the remaining withholdings pursuant to FOIA's
first exemption. Conversely, Plaintiff's motion is granted as to the latter and
denied as to the former.

# BACKGROUND[1]

## A. Factual Background

### 1. The Parties

Osen LLC is a law firm with offices in Hackensack, New Jersey, and New York City. (Compl. ¶ 8). It describes itself as "primarily represent[ing] victims of international terrorism." (*Id.*). In the case for which Osen seeks documents, Osen describes its work as "represent[ing] hundreds of U.S. service members and family members of U.S. service members killed or injured in Iraq by Iranian-backed terrorists (the 'Clients')." (*Id.* at ¶ 2). Osen states that it has "brought several lawsuits on behalf of its Clients against Iran and several Iranian and Western financial institutions that it alleges helped Iran fund, train, and otherwise support the terrorists who injured Osen LLC's Clients." (*Id.*).

---

[1]    This Opinion draws its facts from the Complaint ("Compl." (Dkt. #1)), and from the parties' submissions in relation to the instant motions. Those submissions include the Declaration of Major General Terry Ferrell ("Ferrell Decl." (Dkt. #31)); the Declaration of Russell L. McIntyre ("McIntyre Decl." (Dkt. #34, 40)); the Declaration of William A. Friedman ("Friedman Decl." (Dkt. #35, 41)); the Supplemental Declaration of Major General Terry Ferrell ("Supp. Ferrell Decl." (Dkt. #43)); the Supplemental Declaration of Russell L. McIntyre ("Supp. McIntyre Decl." (Dkt. #45)); and the Supplemental Declaration of William A. Friedman ("Supp. Friedman Decl." (Dkt. #46)); as well as the exhibits attached to those declarations.

For ease of reference, the Court refers to the parties' briefing as follows: Defendant's Memorandum of Law in Support of Defendant's Motion for Summary Judgment as "Def. Br." (Dkt. #30); Plaintiff's Memorandum of Law in Support of Plaintiff's Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment as "Pl. Br." (Dkt. #38); Defendant's Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Cross-Motion for Summary Judgment as "Def. Reply" (Dkt. #42); and Plaintiff's Reply Memorandum of Law in Support of Plaintiff's Cross-Motion for Summary Judgment as "Pl. Reply" (Dkt. #44).

This dispute concerns FOIA requests that Osen issued to CENTCOM in furtherance of these litigation efforts. CENTCOM is one of nine combatant commands of the United States armed forces. (Ferrell Decl. ¶ 2). CENTCOM directs and oversees military operations within its area of operations ("AOR"), which includes 20 countries in the Middle East, Central and South Asia. (*Id*.). The sections that follow detail Plaintiff's requests and Defendant's responses.

## 2.    Plaintiff's FOIA Requests

On November 15, 2016, Plaintiff requested records regarding 92 attacks on U.S. servicemembers in Iraq that occurred between 2004 and 2011. (Ferrell Decl. ¶ 4). The records largely concerned information related to attacks involving Explosively Formed Penetrators ("EFPs"), a particular type of improvised explosive device ("IED"). (*Id*.). The requests also sought information related to the involvement of what Plaintiff describes as "Shi'a terrorist groups, called the 'Special Groups' by the U.S. military, which were backed by Iran and its Lebanese terror proxy, Hezbollah." (Pl. Br. 1). In response, on December 12, 2016, CENTCOM provided six unclassified documents from the Combined Information Data Network Exchange ("CIDNE") database, a CENTCOM recordkeeping system. (Ferrell Decl. ¶ 5). Throughout 2016 and into June of 2017, Plaintiff submitted 168 additional FOIA Requests to CENTCOM, one for each servicemember injured in the attacks for which Plaintiff sought records. (*Id*. at ¶ 4; Friedman Decl., Ex. 3). CENTCOM has released 7,749 pages of records to Plaintiff. (Ferrell Decl. ¶ 9). Plaintiff did not challenge the adequacy or sufficiency of CENTCOM's document searches, but instead challenged (i) the

failure to release certain records that CENTCOM referred to U.S. Army Central

("ARCENT") for FOIA processing, and (ii) CENTCOM's application of FOIA

exemptions to withhold certain responsive records.  (*Id.* at ¶ 10).

### a.    The ARCENT Referrals

In February, 2017, Plaintiff requested Army Regulation 15-6 ("AR 15-6")

reports for all 168 servicemembers from CENTCOM and the Army.  (Friedman

Decl. ¶ 17).[2]  CENTCOM does not, as a general rule, conduct AR 15-6

investigations; they are conducted by component commands or subordinate

units that are not required to submit their reports to CENTCOM headquarters.

(Ferrell Decl. ¶¶ 12-13).  CENTCOM located 36 full or partial AR 15-6

investigation reports and referred these documents to ARCENT to conduct its

own independent FOIA review.  (*Id.* at ¶¶ 14-15).  ARCENT is a command that

exercises administrative control of U.S. Army forces in the Middle East and

Central Asia; it has its own FOIA staff and FOIA procedures; and it handles

FOIA requests independently of CENTCOM.  (*Id.* at ¶ 16).  ARCENT conducted

the AR 15-6 investigations, created the reports, and is responsible for providing

notifications to servicemembers' primary next of kin.  (*Id.* at ¶ 17).  By June 12,

2018, ARCENT has processed and released 15 of the 36 records to Plaintiff and

stated that it would release an additional eight by the end of that month.

(Supp. Ferrell Decl. ¶ 4).  CENTCOM states that it does not have authority to

---

[2]     AR 15-6 is entitled, "Procedures for Administrative Investigations and Boards of
Officers."  Among other things, it governs investigative reports that describe incidents
where one or more servicemember was killed or wounded in action.  (Friedman Decl.
¶ 17; Ferrell Decl. ¶ 12).

release AR 15-6 reports without release authority from the U.S. Army. (*Id.* at ¶ 7).

### b. The FOIA Exemptions

In the 7,749 pages of documents released by CENTCOM, Plaintiff has challenged redactions on approximately 900 pages. (Ferrell Decl. ¶¶ 23-24). CENTCOM redacted information relating to five categories: (i) convoy operations; (ii) counter-IED equipment; (iii) EFP design, composition, and placement and explosive ordinance disposal ("EOD") techniques; (iv) EFP penetration of armor; and (v) identification of individuals. (*Id.*, Ex. 2 ("*Vaughn Index*") (Dkt. #31-2)).[3]

The first four categories are redacted on the basis of FOIA's first exemption, which protects classified information. (Ferrell Decl. ¶¶ 26-40). CENTCOM states that providing information on the convoy operations would risk providing adversaries with information that would allow them more effectively to plan attacks on American troops. (*Id.* at ¶¶ 32-33). The second category concerns information relating to the use of Counter Remote Controlled Electronic Warfare ("CREW") equipment. (*Id.* at ¶¶ 34-35). CENTCOM argues that disclosure of information on this subject could help adversaries defeat this equipment. (*Id.*). The third category relates to details regarding the design, placement, and deployment of EFPs, and CENTCOM argues that disclosure of this information could reveal how to combine these factors to increase the

---

[3]     A *Vaughn* index typically lists "titles and descriptions of withheld documents," as well as claimed bases of exemption. *N.Y. Times Co.* v. *U.S. Dep't of Justice*, 762 F.3d 233, 237 (2d Cir. 2014); *see generally Vaughn* v. *Rosen*, 484 F.2d 820, 823 (D.C. Cir. 1973).

lethality of these weapons.  (*Id.* at ¶¶ 36-37).  CENTCOM also withheld

information regarding the operations of engineers in EOD teams, as CENTCOM

stated that it would potentially expose EOD teams to greater risks.  (*Id.* at

¶ 38).  The largest category of withholdings consists of material relating to how

EFPs and IEDs penetrated the armor on American vehicles.  (*Id.* at ¶ 39).

CENTCOM has withheld photographs of damage to vehicles, because

CENTCOM argues that the photographs would reveal detailed information

about the vulnerabilities of military vehicles.  (*Id.* at ¶ 40).

The final category of information is withheld pursuant to FOIA's sixth

exemption, which restricts the disclosure of information that would be an

unwarranted intrusion on personal privacy.  (Ferrell Decl. ¶¶ 41-42).

CENTCOM has redacted the names of foreign nationals who were captured on

the battlefield, were interrogated in connection with EFP attacks, were

suspected of involvement in EFP attacks, or provided information to the U.S.

government and its agents.  (*Id.* at ¶ 43).  In addition, CENTCOM has withheld

their telephone numbers, email addresses, biometric information, familial

relationships, and other descriptive information that could lead to their

identification.  (*Id.*).  CENTCOM states that exposure of such information could

result in a number of potentially serious harms to these individuals, and there

is no general public interest in the disclosure of this information.  (*Id.* at ¶¶ 44-

45).  CENTCOM states that it has gone through the records, and has

segregated and disclosed any information that can be disclosed.  (*Id.* at ¶¶ 46-

47).

Plaintiff states that the redactions are internally inconsistent and lists pages that redact information that is released elsewhere. (Friedman Decl., Ex. 4-6). The Court will address these purported inconsistencies, and Plaintiff's other challenges to the withholdings, in greater detail *infra*.

**B.    Procedural Background**

Plaintiff filed its Complaint in this action on June 13, 2017. (Dkt. #1). On November 9, 2017, the Court endorsed a joint letter from the parties setting a schedule for further document processing in an attempt to resolve any remaining disputes between the parties. (Dkt. #22). The parties could not resolve their disputes fully, however, and on January 18, 2018, the Court approved a schedule for the parties to file cross-motions for summary judgment. (Dkt. #26).

On April 24, 2018, Defendant moved for summary judgment, and on May 29, 2018, Plaintiff cross-moved for summary judgment. (Dkt. #29-31, 32-41). On June 12, 2018, Defendant filed a reply memorandum of law in further support of its motion for summary judgment, and on June 26, 2018, Plaintiff filed its reply in further support of its motion for summary judgment. (Dkt. #42-43, 44-46).

Through the parties' helpful briefing in this case, the issues in dispute have narrowed. In its opposition brief and cross-motion, Plaintiff limited its requested releases to five categories:

> 1. All photographs showing EFP damage to vehicles;
> 2. All indications that copper was used in an EFP and the size of the EFP; 3. All information identifying
> (a) terrorist groups, (b) leaders of terrorist groups,

> (c) admitted criminals, (d) public figures, and (e) already
> exposed names (other than persons identified as
> cooperating witnesses); 4. All segregable information
> from entirely withheld pages and images; and 5. All
> records referred to ARCENT.

(Pl. Br. 25). In response, Defendant has provided certain previously-withheld documents and a revised *Vaughn* index for the narrower group of challenged withholdings. (Supp. Ferrell Decl., Ex. 1 ("Revised *Vaughn* Index")). Defendant produced all information that it had disclosed in response to previous FOIA requests, all information regarding the use of copper in EFPs, and remaining references to "names of terrorist groups, public figures, the four 'heads of terrorist groups' specifically identified by Plaintiff, ... and "already exposed names[.]" (Def. Reply 4-5).

In its reply memorandum, Plaintiff challenges three remaining categories of withholdings, which it describes as: "[i] each image of [an EFP] strike point ..., [ii] the size of the EFPs ..., and [iii] names of terrorists other than four Plaintiff specifically identified in its opening brief." (Pl. Reply 1). The Court will now address the three remaining categories of dispute: the EFP size information, the EFP strike photographs, and the redacted names.

## DISCUSSION

### A.   Applicable Law

#### 1.   FOIA Generally

FOIA vests federal courts with "jurisdiction to enjoin [a federal] agency from withholding agency records and to order the production of any agency

records improperly withheld[.]" 5 U.S.C. § 552(a)(4)(B).[4] The statute requires disclosure of any requested "agency records" unless they fall within one of FOIA's enumerated exemptions. *See Grand Cent. P'ship, Inc.* v. *Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999); *Adamowicz* v. *IRS*, 672 F. Supp. 2d 454, 460-61 (S.D.N.Y. 2009), *aff'd*, 402 F. App'x 648 (2d Cir. 2010) (summary order). "The government bears the burden of demonstrating that an exemption applies to each item of information it seeks to withhold, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Florez* v. *Cent. Intelligence Agency*, 829 F.3d 178, 182 (2d Cir. 2016) (quoting *Ctr. for Constitutional Rights* v. *CIA*, 765 F.3d 161, 166 (2d Cir. 2014)).

FOIA thus allows public access to information held by agencies of the federal government, but such access is not limitless: in enacting FOIA, Congress sought to strike a balance between the public's interest in government transparency and accountability, and the Government's need to hold sensitive information in confidence. *See Nat'l Council of La Raza* v. *Dep't of Justice*, 411 F.3d 350, 355-56 (2d Cir. 2005); *Nat. Res. Def. Council, Inc.* v. *U.S. Dep't of Interior*, 36 F. Supp. 3d 384, 397 (S.D.N.Y. 2014) (quoting *John Doe Agency* v. *John Doe Corp.*, 493 U.S. 146, 152 (1989)).

---

[4]     The Second Circuit has explained that "jurisdiction," in this context, refers to a federal court's "remedial power, not subject-matter jurisdiction," meaning that 5 U.S.C. § 552(a)(4)(B) "does not speak to the court's ability to adjudicate a claim, but only to the remedies that the court may award." *Main St. Legal Servs., Inc.* v. *Nat'l Sec. Council*, 811 F.3d 542, 566 (2d Cir. 2016).

## 2. Resolving FOIA Claims at Summary Judgment

Summary judgment is the usual mechanism for resolving FOIA disputes. *N.Y. Times Co.* v. *U.S. Dep't of Justice*, 235 F. Supp. 3d 522, 529 (S.D.N.Y. 2017). A district court considering a FOIA claim "may grant summary judgment in favor of an agency 'on the basis of agency affidavits if they contain *reasonable specificity* of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Cuomo*, 166 F.3d at 478 (quoting *Gallant* v. *NLRB*, 26 F.3d 168, 171 (D.C. Cir. 1994)) (emphasis in *Cuomo*); *see also Garcia* v. *U.S. Dep't of Justice, Office of Info. & Privacy*, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002) ("If the agency's submissions are facially adequate, summary judgment is warranted unless the plaintiff can make a showing of bad faith on the part of the agency or present evidence that the exemptions claimed by the agency should not apply."). "As such, where the agency's submissions are 'adequate on their face,' district courts 'may forgo discovery and award summary judgment on the basis of affidavits.'" *N.Y. Times Co.*, 235 F. Supp. 3d at 529 (quoting *Carney* v. *U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994)). Conversely, "[s]ummary judgment in favor of the FOIA plaintiff is appropriate when an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption." *Nat. Res. Def. Council, Inc.* v. *U.S. Dep't of Interior*, 36 F. Supp. 3d 384, 398 (S.D.N.Y.

2014) (quoting *N.Y. Times Co.* v. *U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 509 (S.D.N.Y. 2007)).

**B.     Analysis**

Defendants invoke two FOIA exemptions: FOIA's first exemption, covering records that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" if they "are in fact properly classified" as such, 5 U.S.C. § 552(b)(1); and FOIA's sixth exemption, covering "the disclosure of [files] which would constitute a clearly unwarranted invasion of personal privacy," *id.* § 552(b)(6). The Court considers the Government's invocation of these exemptions in turn.

**1.     CENTCOM's Withholdings Pursuant to Exemption 1**

**a.     Applicable Law**

FOIA's first exemption ("Exemption 1") shields from disclosure matters that are (i) "specifically authorized under criteria established by an Executive [O]rder to be kept secret in the interest of national defense or foreign policy," and (ii) "in fact properly classified pursuant to such Executive [O]rder[.]" 5 U.S.C. § 552(b)(1). Executive Order 13,526, in turn, authorizes categorizing information as "classified" if (i) "an original classification authority is classifying the information"; (ii) "the information is owned by, produced by or for, or is under the control of the United States Government"; (iii) "the information falls within one or more of" certain enumerated categories, including "intelligence sources or methods"; and (iv) "the original classification authority determines that the unauthorized disclosure of the information reasonably could be

expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage." 75 Fed. Reg. 707 (Dec. 29, 2009). Section 6.1 of the Executive Order defines damage to the national security as "harm to the national defense or foreign relations of the United States from the unauthorized disclosure of information, taking into consideration such aspects of the information as the sensitivity, value, utility, and provenance of that information." 75 Fed. Reg. at 727.

### b. CENTCOM's Withholdings

CENTCOM invoked Exemption 1 in redacting information in a number of categories, and Plaintiff has not challenged many of these redactions. Therefore, the Court can grant summary judgment in favor of Defendant with regard to the withholdings that are not opposed by Plaintiff. These include all withholdings pertaining to convoy operations; use of counter-IED equipment; design, placement, and deployment of EFP/IEDS, excepting withholdings regarding the size of EFPs; and mission parameters limitations and capabilities of EOD teams. (Def. Reply 4). At this stage, Plaintiff challenges CENTCOM's Exemption 1 withholdings regarding images of EFP strikes and information regarding the size of the EFPs. (Pl. Reply 1).

To satisfy Executive Order 13,526's fourth requirement of a reasonable expectation of damage to national security as a consequence of disclosure, CENTCOM provides the Declaration of Major General Terry Ferrell, CENTCOM's Chief of Staff and Original Classification Authority ("OCA").

(Ferrell Decl. ¶¶ 1-3). General Ferrell states that disclosure of the redacted

information on EFP size could "provide adversaries with potentially useful

insights into how best to defeat American weapons systems, including the

specific methods that are most likely to be effective in exploiting vulnerabilities

of American military equipment." (Supp. Ferrell Decl. ¶ 11 (citing Ferrell Decl.

¶¶ 36, 37)). He states that disclosure of each "individual photograph showing

the penetration of armor by EFPs that has been withheld from CENTCOM's

responses to Plaintiff's FOIA requests [would] reveal[] information about the

vulnerabilities of American war-fighting equipment." (*Id.* at ¶ 15).

### c. CENTCOM's Withholdings Pursuant to Exemption 1 Are Overbroad Due to Prior Official Disclosures

#### i. CENTCOM Fails Adequately to Justify the EFP Size Redactions

Plaintiff challenges CENTCOM's redactions under Exemption 1 primarily

on the ground that the information withheld has been publicly disclosed

previously and thus is not entitled to protection under those exemptions. (Pl.

Br. 16). The law is clear that Exemption 1 "may not be invoked to prevent

public disclosure when the government has *officially* disclosed the *specific*

information being sought." *Hudson River Sloop Clearwater, Inc.* v. *Dep't of*

*Navy*, 891 F.2d 414, 421 (2d Cir. 1989). Official disclosure of specific

information is deemed to waive classification under Exemption 1, and

information "is deemed to have been officially disclosed if it" (i) "is as specific as

the information previously released," (ii) "matches the information previously

disclosed," and (iii) "was made public through an official and documented

disclosure." *Wilson* v. *CIA*, 586 F.3d 171, 186 (2d Cir. 2009) (alterations and citation omitted).

Plaintiff contends that information on EFP size withheld by CENTCOM under Exemption 1 has been previously disclosed to the public. Plaintiff points out that CENTCOM has disclosed EFP size in a number of the pages provided to Osen. (Pl. Br. 21; Pl. Reply 9 (citing Supp. Friedman Decl., Ex. 14)). In a summary of the material it has received from CENTCOM, Plaintiff identifies over 40 separate pages that include descriptions of EFP size. (*See* Supp. Friedman Decl., Ex. 14 (providing descriptions such as "Assessment: 2 x 8 EFP 15lbs HME in each cellphone initiated w/ DTMF board used as secondary devices"; "INITAL ASSESSMENT IS A 10-12 'EFP')"; and "The IED was a three array, one 10 inch and two 6-8 inch EFPs with copper liners")). Defendant offers no explanation for why this material is substantively different from the remaining redacted material on EFP size.

On the subject of EFP size, the Court agrees with Plaintiff that the material already disclosed constitutes a waiver of Exemption 1 by official disclosure. Nowhere in its briefing does CENTCOM dispute that a large number of disclosures contain information on EFP size. CENTCOM did not provide objections to disclosure on EFP size in its initial motion, only stating its objections in opposition and in the supplemental declaration of General Ferrell attached to Defendant's opposition. (Def. Reply 16-17; Supp. Ferrell Decl. ¶ 11). CENTCOM states that this was merely the result of oversight and offers no independent reason for classification of the EFP sizes. (Supp. Ferrell Decl.

14

¶ 11 ("[The] original declaration also should have included 'the size of the EFP'

in the list of '[c]ritical variables in EFP effectiveness.' The explanations

provided in paragraphs 36 and 37 of my original declaration ... apply with

equal force to information regarding the size of an EFP.")). However, the

declaration does not address the material on EFP size that was disclosed in the

prior releases. Osen identifies 11 pages where EFP size is redacted against

over 40 where it is disclosed. (*See* Friedman Supp. Decl., Ex. 14 (listing the

pages where material is redacted as "1:39, 1:196, 1:709, 1:712, 1:1410,

1:1412, 1:1429,1:1529, 1:1820, 2:85, [and] 2:86")). In the absence of further

explanation for why these redactions are substantively different than the

material already disclosed, the Court determines that CENTCOM has officially

disclosed the material on EFP size.

The EFP size revealed in the majority of pages through official FOIA

disclosures is "as specific" as the prior disclosures. *Wilson*, 586 F.3d at 186.

CENTCOM does not attempt to explain why the information that has been

withheld poses risks that the disclosed material did not, nor does it offer an

explanation for why prior disclosures in this area were mistakes. The Court

holds that Plaintiffs are entitled to the remaining material on EFP size. The

Court now turns to the redacted photographs of EFP strikes.

### ii. Prior CENTCOM Disclosures of EFP Strike Photographs Do Not Require CENTCOM to Disclose All Such Photographs

In support of disclosure of EFP strike photographs, Plaintiff points to

prior FOIA disclosures that included photographs that were clear and close up

of the same type of EFPs used on the same types of vehicles as the photographs sought here. (*See* Pl. Br. 17; Pl. Reply 3-4). Plaintiff discusses official press conferences in which Department of Defense ("DoD") representatives discussed the dangers of EFPs and notes "DoD released a close-up picture of an EFP strike on a High Mobility Multipurpose Wheeled Vehicle ('Humvee') to CNN" to reveal the dangers of EFPs. (Pl. Br. 6 (citing Friedman Decl., Ex. 10)). Furthermore, Plaintiff argues that CENTCOM's disclosures in this case frequently "reveal the fact that an EFP penetrated the vehicle's armor and the SIGACT or the redaction box usually shows the exact location of that penetration." (Pl. Reply 5). Therefore, Plaintiff argues that the previously released material is as "specific" as images that CENTCOM has withheld.

However, the Court does not find that prior disclosures of information regarding EFPs require the disclosure of the photographs of EFP strikes that Plaintiff has requested here. "In the national security context ... [the Court] 'must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record.'" *Am. Civil Liberties Union* v. *Dep't of Justice*, 681 F.3d 61, 69 (2d Cir. 2012) (citing *Wolf* v. *CIA,* 473 F.3d 370, 374 (D.C. Cir. 2007)). Plaintiff suggests that because CENTCOM has already made clear the effectiveness of EFPs against the type of armor in American vehicles, there is no compelling reason for continued withholding. (*See* Pl. Reply 6). Plaintiff points to a CNN video which showed damage to an American vehicle from an EFP strike. (Friedman Decl., Ex. 10). While

16

CENTCOM has certainly revealed the general risks of EFPs, this general disclosure does not overcome Defendant's argument the photographs' level of detail and specificity would reveal new and unexpected weaknesses to adversaries.  CENTCOM has stated that the risks lie in the connection of specific strikes to specific damage, which the withheld photographs reveal. (Def. Reply 13).  The Court cannot disregard the declarations of General Ferrell, who has stated: "Each individual photograph showing the penetration of armor by EFPs that has been withheld from CENTCOM's responses to Plaintiff's FOIA requests reveals information about the vulnerabilities of American war-fighting equipment." (Supp. Ferrell Decl. ¶ 15).  Courts are instructed to defer to such determinations where they appear "logical or plausible." *Wilner* v. *NSA*, 592 F.3d 60, 73 (2d Cir. 2009).  They do here.

While Plaintiffs offer their own expert reports and rationales for why the information at issue would not provide assistance to adversaries, the Court considers the argument that the EFP strike photographs' specificity is more revealing to adversaries to be both logical and plausible.  The standard for prior official disclosure does not speak to general topical overlap, but rather it requires a release of the specific information.  "[D]isclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure." *Wolf*, 473 F.3d at 378 (emphasis in original).  The Court does not consider the official disclosures regarding the effectiveness of EFPs generally to require disclosure

of the specific photographs.  The Court next examines the limited prior disclosures of similar photographs of EFP strikes.

The Court does not find the limited disclosures of photographs of singular instances of EFP strikes in earlier productions to separate FOIA requesters to require their disclosure to Osen in this case.  Plaintiff points to a more limited 2015 production by CENTCOM, which included photographs of an EFP strike from single incident.  (Supp. Ferrell Decl. ¶ 13).  CENTCOM acknowledges that it cannot continue to redact material from that incident due to prior official disclosure, and it has removed redactions for the photographs of that specific attack.  (*Id.* at ¶¶ 12 n.1, 14).  However, CENTCOM states that the release in 2015 was overbroad and certain images should not have been disclosed.  (*Id.* at ¶ 13).

The Court also does not find that disclosure of singular set of photographs requires the disclosure of the broader category of images that Plaintiff requests.  It accepts General Ferrell's statement that each individual EFP strike image is a separate incident with separate potential revelations of vulnerabilities.  The Court further accepts Defendant's argument that "[b]ecause each attack presents its own specific, individualized factual scenario, prior official disclosure of information about one such attack does not categorically waive CENTCOM's ability to assert FOIA Exemption 1 to withhold classified information about entirely different incidents."  (Def. Reply 12-13).  Plaintiff's arguments regarding CENTCOM's official disclosures suffer a "Goldilocks problem":  Disclosures about the general vulnerabilities are too

broad to require these disclosures, and disclosures about specific incidents are too narrow. Neither set of disclosures is specific enough to satisfy the requirement for prior disclosure of the information.

However, while CENTCOM may not have disclosed the EFP strike photographs, Osen argues that ARCENT has disclosed such photographs. The Court must therefore examine whether ARCENT's disclosures waive Exemption 1 with respect to CENTCOM.

### iii. The FOIA Disclosures by ARCENT Require the Disclosure of the EFP Strike Photographs by CENTCOM

Plaintiff argues that even if CENTCOM has not officially disclosed EFP strike photographs, ARCENT has disclosed photographs of EFP strikes. (Pl. Br. 21; Pl. Reply 8). CENTCOM does not dispute that ARCENT has disclosed EFP strike photographs. (*See* Def. Reply 14). CENTCOM argues that disclosures by other agencies do not require disclosure by CENTCOM, and points to decisions holding that disclosures by the FBI did not waive the CIA's availability to invoke FOIA Exemptions. (*Id.* (citing *Florez* v. *CIA*, 829 F.3d 178, 186 (2d Cir. 2016); and *Mobley* v. *CIA*, 806 F.3d 568, 583 (D.C. Cir. 2015))). Defendant argues that ARCENT did not consult with CENTCOM, and CENTCOM would have objected to the level of ARCENT's disclosures.

The Court does not consider the opinions cited by Defendant relevant to the question at issue. Both of those opinions turned on the separate agencies' separate right to assert FOIA exemptions. *Florez*, 829 F.3d at 178 (holding

waiver was "a privilege reserved to the agency asserting a *Glomar* response");[5]
*Mobley*, 806 F.3d at 583 ("Disclosure by one federal agency does not waive
another agency's right to assert a FOIA exemption."). While CENTCOM and
ARCENT contain separate FOIA staffs, neither is an independent agency. Both
are DoD components. Considering that "disclosure, not secrecy, is the
dominant objective of the Act," *Dep't of Air Force* v. *Rose*, 425 U.S. 352, 361
(1976), the Court does not consider it appropriate to limit a waiver of
Exemption 1 to subcomponents of the same agency. DoD provides a regulation
governing FOIA disclosures between and among its subcomponents, suggesting
that the disclosures of one subcomponent cannot be considered independent of
others. *See* 32 C.F.R. § 286.7(d)(2)(i). Given CENTCOM's reliance on the
shared DoD oversight of the two subcomponents to justify the referral of
records to ARCENT, it is contradictory for CENTCOM to then argue that
ARCENT's disclosures have no effect on CENTCOM's ability to withhold
information. The Court holds that a waiver of an exemption by ARCENT
applies to other components of DoD, including CENTCOM.

Unlike in the context of its own prior disclosures, CENTCOM does not
address distinctions between what ARCENT has disclosed and the information
withheld. ARCENT has disclosed photographs of EFP strikes in connection

---

[5]     "A *Glomar* response, which originates from a FOIA case concerning records related to
the Hughes Glomar Explorer, is when "'an agency ... pursuant to FOIA's statutory
exemptions, refuse[s] to confirm or deny the existence of certain records in response to
a FOIA request[.]'" *N.Y. Times Co.* v. *Cent. Intelligence Agency*, 314 F. Supp. 3d 519,
524 (S.D.N.Y. 2018) (quoting *Wilner* v. *Nat'l Sec. Agency*, 592 F.3d 60, 67 (2d Cir.
2009)).

with a detailed summary of a June 2, 2007 attack on American servicemembers in Iraq. (Supp. Friedman Decl., Ex. 26 (providing unredacted photographs at 55-65). This material provides specific photographs connected to a specific attack, with dates and detailed location information. (*Id.*). CENTCOM offers no suggestion that the disclosure was a mistake. The photographs in the ARCENT disclosure provide the precise type of information that General Ferrell suggests would reveal vulnerabilities through an official disclosure. Evidently, ARCENT has made a determination that this type of material does not pose a risk to national security. Based on these facts, the Court can determine that the ARCENT disclosures of photographs of EFP strikes were official disclosures, provided the specific information at issue, and matched the information previously disclosed. *See Wilson*, 586 F.3d at 186. Therefore, the Court finds that the information disclosed by ARCENT requires disclosure of any similar photographs of EFP strikes withheld by CENTCOM.

> **iv. The Court Does Not Determine Whether Information in the Public Domain Requires Disclosure of the EFP Strike Photographs**

Plaintiff's remaining arguments for disclosure are based on substantive disputes as to the extent to which the disclosures would harm national security. (Pl. Reply 4-6, 22-23). These arguments rely on the declarations of Plaintiff's expert and the widespread discussion of the vulnerabilities of American vehicles in the public domain. CENTCOM responds by relying on General Ferrell's statements as to the risks of disclosure. (Supp. Ferrell Decl. ¶ 13). These disputes are factually intensive, and the Court is hesitant to

overturn the determinations of government officials in the national security context. *Am. Civil Liberties Union*, 681 F.3d at 69. However, the Court does not consider a substantive examination of what vulnerabilities this information might reveal necessary in this case, as the prior disclosures by ARCENT require disclosure here.[6] The Court rejects CENTCOM's Exemption 1 claim and now turns to the information withheld under FOIA's sixth exemption

### 2. CENTCOM's Withholdings Pursuant to Exemption 6

#### a. Applicable Law

FOIA's sixth exemption ("Exemption 6") shields from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy[.]" 5 U.S.C. § 552(b)(6). "Exemption 6 is intended to 'protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information.'" *Wood* v. *F.B.I.*, 432 F.3d 78, 86 (2d Cir. 2005) (citing *U.S. Dep't of State* v. *Washington Post Co.*, 456 U.S. 595, 599 (1982)).

To determine whether an Exemption 6 withholding is proper, courts employ a two-part test:

> First, [the Court] must determine whether the personal information is contained in a file similar to a medical or personnel file .... At the second step ... [the Court] balance[s] the public's need for the information against the individual's privacy interest to determine whether

---

[6] CENTCOM asks the Court to disregard Plaintiff's Local Civil Rule 56.1 Statement and the evidence presented by Plaintiff's expert (Dkt. #39, 40). (*See* Def. Reply 24-25). The Court does not address this dispute, as the Court does not consider Plaintiff's expert report to be necessary to the determination. Plaintiff's 56.1 statement consists largely of information available in the parties' declarations, so the Court relies on the underlying declarations rather than Plaintiff's summary thereof.

> the disclosure ... would constitute a "clearly unwarranted invasion of personal privacy."

*Wood*, 432 F.3d at 86 (internal citations omitted).  The first element of the test is not a difficult hurdle to clear, as the Second Circuit considers "a record ... a 'similar file' if it contains personal information identifiable to a particular person."  *Cook* v. *Nat'l Archives & Records Admin.*, 758 F.3d 168, 175 (2d Cir. 2014).

The second step is a more searching inquiry.  The determination of whether the disclosure is an unwarranted invasion of personal privacy, "require[s] a balancing of the individual's right of privacy against the preservation of the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny.'"  *Rose*, 425 U.S. at 372.  "The privacy side of the balancing test is broad and encompasses all interests involving the individual's control of information concerning his or her person."  *Wood*, 432 F.3d at 88 (internal citation and quotation marks omitted).  On the other side of the equation:

> The only relevant public interest in the FOIA balancing analysis is the extent to which disclosure ... would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.  [T]he purposes for which the request ... is made ... have no bearing on whether information must be disclosed[.]

*Bibles* v. *Oregon Nat. Desert Ass'n,* 519 U.S. 355, 355-56 (1997).

### b. CENTCOM's Withholdings

CENTCOM has relied on Exemption 6 to withhold: "names and/or other identifying information of third-party individuals, nearly all (if not all) of whom are foreign nationals, who: (i) were captured on the battlefield; (ii) were interrogated in connection with investigations into particular EFP attacks; (iii) were suspected of involvement in particular EFP attacks; and/or (iv) provided information to U.S. government operatives." (Ferrell Decl. ¶ 43). In the course of summary judgment proceedings and in response to Plaintiff's challenges, CENTCOM reviewed certain pages and removed redactions regarding four named individuals, Muqtada al-Sadr, Qais Khazali, Laith Khazali, and Ali Musa Daqduq. (Supp. Ferrell Decl. ¶ 9). CENTCOM also agreed to remove redactions regarding "any remaining references to the names of terrorist groups, public figures, the four individuals identified ..., and 'already exposed names' within particular records, that continue to be withheld pursuant to Exemption 6[.]" (*Id.* at ¶ 12 n.1).

To support the redactions of personally identifying information, General Ferrell states that individuals who provided information to the United States could be subject to retaliation, and their provision of information may not be apparent on the face of the document. (Supp. Ferrell Decl. ¶ 22). He further states that the information on many of these individuals consists of unverified intelligence reporting, and these individuals' involvement in attacks on American and allied forces is unconfirmed. (*Id.* at ¶ 23). Furthermore, many of

these individuals may currently be aligned with the United States in ongoing campaigns in Iraq. (*Id.*).

### c. CENTCOM's Withholdings Pursuant to Exemption 6 Were Proper

CENTCOM presents a straightforward case for redaction: The redacted material is personally identifying, disclosure poses risks for the individuals, and the public's interest in disclosure is minimal. The material sought here is personally identifying information: "names …, telephone numbers, email addresses, biometric information (such as fingerprints), familial relationships, and other descriptive information relating to these individuals where the information could be used by those who know or have knowledge of these individuals to identify them." (Def. Br. 22-23). None of the individuals whose personally identifying information was redacted has consented to disclosure, and each faces wide-ranging harms from disclosure including the possibility of violent reprisals for their involvement in U.S. intelligence-gathering. (*Id.* at 23). On the other side of the balancing equation, CENTCOM argues, is only Plaintiff's interest in pursuing civil litigation, and the information would reveal nothing about CENTCOM's operations and how it pursues its mission. (*Id.* at 23-24).

Plaintiff makes clear that it does not seek the names of every individual, and acknowledges grounds for withholding the names of informants. (*See* Pl. Br. 13 ("Plaintiff does *not* seek every name contained in the documents and does not oppose redaction of the names of confidential informants in category (iv).")). Given CENTCOM's agreement to disclose "the names of terrorist

groups, public figures, the four individuals identified …, and 'already exposed names'" (Ferrell Supp. Decl. ¶ 12 n.1), Plaintiff's remaining request is for the disclosure of the "names of terrorists other than four Plaintiff specifically identified in its opening brief" (Pl. Reply 1). Plaintiff does not argue that the records fall outside of Exemption 6's reference to "similar files." However, Plaintiff argues that the individuals at issue are not entitled to privacy protection by the U.S. Government due to these individuals' malign activities in Iraq and other Government agencies' disclosure of names of potentially similar individuals among lists of insurgents in Iraq. (*See* Pl. Br. 11-13). Plaintiff further argues that even if the individuals whose names were redacted were entitled to minimal privacy protection, the public interest in revealing Iranian operations in Iraq outweighs these minimal interests. (*See id.* at 14-16).

Plaintiff's arguments are flawed. To begin, Plaintiff repeatedly and continuously refers to the redacted names as belonging to terrorists. Plaintiff presents no evidence that these individuals have been adjudicated or determined to be members of a foreign terrorist organization or convicted of any crime in any court in the United States or abroad. As Defendant points out "it is possible, but by no means certain, that the individuals identified as perpetrators in these documents actually were involved in hostile acts." (Supp. Ferrell Decl. ¶ 23). Therefore, the Court does not refer to them as terrorists but as the "redacted individuals." Relatedly, many of Plaintiff's arguments are premised on these redacted individuals' presumed crimes. (*See, e.g.*, Pl. Reply 2 ("CENTCOM also does not explain why switching sides entitles terrorists to

privacy as to their past crimes"); Pl. Br. 25 (seeking information on "admitted criminals")).  Even the specific redactions to which Plaintiff calls attention do not prove that the individuals in question are "terrorists."  Plaintiff points to individuals who admit membership in Jaysh al-Mahdi ("JAM") and Asa'ib Ahl Al-Haq ("AAH").  (Pl. Reply 2-3).  Neither of these organizations is listed by the State Department as a Foreign Terrorist Organization ("FTO").  *See* Office of Counterterrorism, U.S. Dep't of State, Designated FTOs (Mar. 14, 2018), https://www.state.gov/j/ct/rls/other/des/123085.htm.  These individuals may indeed be responsible for serious crimes or attacks against U.S. forces, but their involvement remains unproven and is ultimately irrelevant to the determinations of this Court.  Therefore, the Court refrains from characterizing them in the manner described by Plaintiff.  As Plaintiff's request is limited to "names of terrorists other than four Plaintiff specifically identified in its opening brief," the absence of any information demonstrating that any withheld names belong to "terrorists" weakens Plaintiff's claims to disclosure.

The Court determines that the individuals whose identifying information has been redacted have a privacy interest in that information.  "It is well established that identifying information such as names, addresses, and other personal information falls within the ambit of privacy concerns under FOIA." *Associated Press* v. *U.S. Dep't of Def.*, 554 F.3d 274, 285 (2d Cir. 2009).  In *Wood*, then-Judge Sotomayor made clear: "[t]he privacy side of the balancing test is broad and encompasses all interests involving the individual's control of information concerning his or her person." *Wood*, 432 F.3d at 88 (internal

citations omitted).  In the context of investigations, courts have held that "[i]ndividuals, whether targets, investigators, witnesses, or third parties … have a privacy interest in not being associated with a law enforcement investigation, and in protecting the details of their statements given in the course of such investigations." *See, e.g.*, *Conti* v. *U.S. Dep't of Homeland Sec.*, No. 12 Civ. 5827 (AT), 2014 WL 1274517, at *18 (S.D.N.Y. Mar. 24, 2014).  While Plaintiff suggests that any potential risks to these individuals are overstated (*see* Pl. Br. 13-14), the Court has no reason to doubt General Ferrell's declaration.  *See Long* v. *Office of Pers. Mgmt.*, 692 F.3d 185, 190-91 (2d Cir. 2012) (stating that agency affidavits are "accorded a presumption of good faith").  General Ferrell warns of reprisals against individuals who provided information to the U.S. military and potential consequences for individuals who may be linked with attacks on Americans without reliable support.  (*See* Supp. Ferrell Decl. ¶ 23). The Court does not consider the potential reputational damage or the risk of violence to individuals who are identified based on uncorroborated intelligence reports to be "mere possibilit[ies]."  *See Rose*, 425 U.S. at 380 n.19.  Instead, the Court considers the warnings of General Ferrell to reveal a realistic risk of serious harms to these individuals from disclosure.  None of these individuals has consented to disclosure, and the Court does not believe they have forfeited a right to their privacy by virtue of the seriousness of the alleged conduct.

The Court does not find that prior disclosures of names of individuals linked to attacks in Iraq require disclosure of the redacted individuals' names. Plaintiff argues that the U.S. Government has disclosed numerous lists of

individuals linked to insurgent activity and attacks on American servicemembers in Iraq, and therefore these individuals' names may have been the subject of prior disclosure. (*See* Pl. Br. 14 ("Treasury and State Department designations of terrorists ... provides these terrorists' names, biographical details (even including passport numbers), and descriptions of their terrorist acts in Iraq and links to Iran.")). Plaintiff cites *Broward Bulldog, Inc.* v. *U.S. Dep't of Justice*, No. 16-61289-CIV, 2017 WL 2119675, at *12 (S.D. Fla. May 16, 2017), which held the FBI could not withhold names under Exemption 6 when it had previously disclosed these names. (*Id.*). As CENTCOM points out, there is no suggestion that CENTCOM has disclosed these names in any manner. (Def. Reply 21). Furthermore, CENTCOM has agreed to disclose the names of "public figures" and the specific individuals that Plaintiff has identified, suggesting that many of the figures disclosed by other government agencies are no longer redacted. (*Id.* at 4-5).[7] The mere assertion that existing lists of individuals may overlap with the redacted individuals does not demonstrate that CENTCOM has disclosed any names that remain redacted.

The Court also does not find that disclosure of these names would serve the public interest by advancing "the core purpose of the FOIA." *See U.S. Dep't*

---

[7]    Plaintiff argues that certain redactions suggest that some public figures' names remain redacted. (*See* Pl. Reply 1 n.1). Given CENTCOM's accommodations during this litigation, as well as its demonstrated willingness to address redactions where Plaintiff points to inconsistencies, the Court sees no reason to doubt CENTCOM's good-faith efforts to identify the sufficiently public individuals in the redacted material or its continued willingness to work with Plaintiff's in addressing these disputes. (*See* Supp. Ferrell Decl. ¶ 12 n.1).

*of Justice* v. *Reporters Comm. for Freedom of Press*, 489 U.S. 749, 775 (1989).

The Supreme Court has held that the core purpose of FOIA is to inform the public on Government agencies' performance of their missions and how they conduct operations or activities. *Id.* at 773. The names here may provide additional material connecting Iran to attacks on American soldiers, but it is not clear how the material would add to public understanding of how CENTCOM operates. Plaintiff suggests that the material would "shed light on the U.S. government's and CENTCOM's conduct of the war and peacekeeping operations in Iraq — and to what extent the U.S. should hold Iran responsible for attacks on its forces." (Pl. Br. 15). Plaintiff does not attempt to demonstrate how the personally identifying information would reveal new information about the former, or how the latter is a core purpose of FOIA. Furthermore, the Iranian-proxy groups that Plaintiff discusses throughout have been disclosed, and public information already has revealed Iran's role in backing militia groups across Iraq. (*See id.* ("Iran's vicious targeting of U.S. soldiers in Iraq is one of the defining geopolitical events of recent years[.]")). Plaintiff does not explain why identifying individual alleged members of any of these groups would provide greater insight into CENTCOM's efforts to counter Iran.

Plaintiff also objects to CENTCOM's description of its clients' interest in the personally identifying information as primarily to advance its position in civil litigation. (Pl. Br. 15 ("Plaintiff takes exception to CENTCOM's characterization of the Victims' interest in the records as purely to win

lawsuits.").  Plaintiff states that it helps soldiers tell their stories and that its lawsuits serve the public good by holding foreign adversaries accountable.  (*Id.* at 15-16).  Civil litigation can certainly serve the public by enforcing the laws and holding governments, corporations, and individuals accountable for misconduct.  It is no insult to suggest that Plaintiff hopes to further its litigation efforts by gaining this information, but it is not a core purpose of FOIA to advance the goals of civil litigants, no matter how noble the litigants' intentions.  "[Plaintiff's] need to obtain the information for a pending civil suit is irrelevant, as the public interest to be weighed has nothing to do with [Plaintiff's] … situation."  *Horowitz* v. *Peace Corps*, 428 F.3d 271, 278-79 (D.C. Cir. 2005).  The Court does not find the public interest would be served by disclosure here, and the privacy interests of the redacted individuals outweigh any claim regarding public interests.  The Court finds that the remaining redactions of personally identifying information are exempt from disclosure under Exemption 6.

### 3.    Defendant Is Entitled to Summary Judgment on the Referrals to ARCENT

In its reply, Plaintiff touches on the ARCENT referrals briefly and does not list them among its remaining areas of dispute.  (Pl. Reply 1, 10).  Defendant has explained that the requested AR 15-6 reports are not regularly produced to CENTCOM.  (Supp. Ferrell Decl. ¶ 6).  CENTCOM has explained that it could not process the AR 15-6 records without coordinating with ARCENT and gaining approval from a classification authority within in the U.S. Army.  (*Id.* at ¶¶ 16-17, 21).

The Court agrees that Defendant has not improperly withheld any of the requested AR 15-6 reports. The regulation of the DoD governing FOIA disclosures provides the following:

> When the DoD Component initially processing the request believes that a different DoD Component or other Federal agency is best able to determine whether to disclose the record, the DoD Component typically should refer the responsibility for responding to the request regarding that record to that agency. Ordinarily, the agency that originated the record will be presumed to be best able to make the disclosure determination. Under these circumstances, the DoD Component or other Federal agency receiving the referral will ultimately make a release determination on the records and respond to the requester.

32 C.F.R. § 286.7(d)(2)(i). CENTCOM has complied with this regulation and has remained involved in the process, communicating with ARCENT on the referred records. (Ferrell Decl. ¶¶ 19, 22). Plaintiff does not dispute that CENTCOM has complied with the regulation at issue or that ARCENT has continued to produce material. The Court sees no grounds to conclude that CENTCOM has improperly withheld any relevant documents, rather than merely relying on the "the agency that originated the record" to make the appropriate determination.

## CONCLUSION

For the reasons stated in this Opinion, the Government's motion for summary judgment is GRANTED in part and DENIED in part, and Plaintiff's cross-motion for summary judgment is DENIED in part and GRANTED in part. CENTCOM is directed to produce the redacted photographs of EFP strikes and the material on EFP size. Plaintiff's remaining requests are denied.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated: March 22, 2019
New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge